******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# CT FREEDOM ALLIANCE, LLC, ET AL.
## *v.* DEPARTMENT OF EDUCATION
### ET AL.
#### (SC 20627)

Robinson, C. J., and D'Auria, Ecker, Alexander and Keller, Js.

*Syllabus*

The plaintiffs sought relief in connection with a mandate issued by the defendants, the governor of the state of Connecticut, the Department of Education, and the education commissioner, that required children to wear face masks in school during the COVID-19 pandemic. In response to the pandemic, the governor declared a public health and civil preparedness emergency in March, 2020, and, pursuant to statute (§§ 19a-131a and 28-9), thereafter issued certain executive orders to protect public health and safety, including an order cancelling all in-person public school classes for the remainder of the school year. The department later issued guidance to school districts on how to safely reopen schools the following school year, which directed school districts to adopt policies requiring that students and staff wear masks or other forms of face coverings when at school. The governor then issued an executive order authorizing the commissioner to issue "binding guidance" for the operation of schools, deemed necessary to respond to the COVID-19 pandemic. That order, which was extended several times, applied retroactively and provided that the commissioner's binding guidance, including the previously issued guidance regarding face masks, was not a regulation for purposes of the Uniform Administrative Procedure Act (UAPA) (§ 4-166 et seq.). The defendants thus were permitted to issue and enforce the binding guidance without first providing notice to the public and an opportunity to be heard. The plaintiffs challenged the legality of the mask mandate and sought declaratory and injunctive relief, claiming, inter alia, that the mandate was improperly issued and extended, and that it violated the rights of schoolchildren to a free public education under article eighth of the Connecticut constitution. The trial court granted the defendants' motion for summary judgment and rendered judgment thereon, from which the plaintiffs appealed. While the appeal was pending, the department repealed the school mask mandate, and the defendants thereafter moved to dismiss the appeal as moot. Although the plaintiffs did not contend that a live controversy existed, they opposed the motion to dismiss on the ground that their claims were reviewable under either the capable of repetition, yet evading review exception or the voluntary cessation exception to the mootness doctrine.

*Held* that neither the capable of repetition, yet evading review exception nor the voluntary cessation exception to the mootness doctrine applied in the present case, and, because this court agreed that it could no longer provide the plaintiffs with any practical relief, it dismissed the plaintiffs' appeal for lack of subject matter jurisdiction:

1. The plaintiffs failed to establish that their claims were capable of repetition, yet evading review, as there was no reasonable likelihood that the questions presented in this appeal would arise again in the future:

In determining whether the questions presented in this appeal would recur, the appropriate inquiry was not whether the mask mandate itself was likely to be reinstated, which was relevant only to the plaintiffs' final substantive claim that the mask mandate violates the rights of schoolchildren to a free public education, but whether there was a reasonable likelihood that the particular governmental actions the plaintiffs challenged would arise in a similar manner in the future, and that likelihood did not exist with respect to the plaintiff's three procedural claims relating to the issuance and extension of the school mask mandate.

With respect to the plaintiffs' claim that the department violated the UAPA by issuing the mask mandate through its guidance, given the

unique nature of the COVID-19 pandemic and the defendants' newly acquired knowledge from dealing with it, it was unlikely that, and purely speculative whether, the defendants would address future civil preparedness emergencies in the same way, that is, by issuing guidance that is retroactively deemed to be binding and exempt from the definition of "regulation" in the UAPA via an executive order.

With respect to the plaintiff's claim that the governor unlawfully extended the executive order multiple times, it was speculative whether there would be another pandemic of the same extended nature or that a governor would employ the same procedure in a future emergency, especially when the legislature had taken steps to validate the governor's issuance and extension of executive orders under § 28-9 and had gained the knowledge and experience to determine whether to validate or nullify such orders if similar circumstances were to arise in the future.

The plaintiffs' claim that the legislature unconstitutionally delegated its legislative power in violation of the separation of powers provision of the Connecticut constitution by passing multiple special acts that ratified and allowed the governor to extend his emergency declarations was also based on speculation that a pandemic of the same magnitude and duration would occur in the future, and it was reasonable to assume that, because the majority of civil preparedness emergencies previously declared in Connecticut had lasted only a few weeks or months, the legislature would not likely be confronted with a similar emergency in which the governor would seek to extend his emergency powers in a manner beyond what this court deemed permissible in *Casey* v. *Lamont* (338 Conn. 479).

With respect to the plaintiffs' claim that the mask mandate violated the rights of schoolchildren to a free public education, because the mask mandate was repealed during the pendency of the plaintiffs' appeal and the defendants have not indicated that they intend to reinstate the mandate, it was speculative whether the defendants would issue another school mask mandate, and concluding that they would do so would require this court to engage in scientific and political speculation as to how the current pandemic would proceed and how the legislative and executive branches would respond.

2. The voluntary cessation exception did not apply to overcome the mootness of the controversy in the present case:

Although the voluntary cessation of a challenged practice does not deprive a court of the power to determine the legality of the practice, it is appropriate to afford some deference to governmental actors who have voluntarily ceased the allegedly unlawful conduct and to their representations that certain conduct has been discontinued.

This court had no reason not to believe the defendants' representations that they had repealed the mask mandate because the circumstances of the COVID-19 pandemic had changed and that they had no intention to reinstate the mandate, the plaintiffs did not suggest that the defendants' motivation in repealing the mask mandate was to avoid an adverse ruling, and there was no evidence that the defendants repealed the mandate in response to litigation or with the intent to reinstate the mandate after a dismissal of the plaintiffs' appeal.

Argued September 7, 2022—officially released January 12, 2023*

*Procedural History*

Action for, inter alia, a judgment declaring the legality of certain school mask requirements that the defendants promulgated and issued during their response to the COVID-19 pandemic, brought to the Superior Court in the judicial district of Hartford, where Governor Ned Lamont was added as a defendant; thereafter, the court, *Moukawsher, J.*, granted the defendants' motion for summary judgment and rendered judgment thereon, from which the plaintiffs appealed. *Appeal dismissed.*

*Norman A. Pattis*, with whom, on the brief, was

*Cameron L. Atkinson*, for the appellants (plaintiffs).

*Timothy J. Holzman*, assistant attorney general, with whom were *Darren P. Cunningham*, assistant attorney general, and, on the brief, *William Tong*, attorney general, and *Clare Kindall*, former solicitor general, for the appellees (defendants).

*Opinion*

D'AURIA, J. The case before us, when commenced, involved one of the great public controversies of the day. For nearly three years, our state, our nation, and our world have experienced a global pandemic unrivaled in severity for more than one century. Among other things, this pandemic has been marked by the wearing of masks over our noses and mouths—both voluntarily and by mandate—aimed at abating the transmission of the highly virulent and infectious disease known as COVID-19 among the population. Both the effectiveness of masking and the justification for and legality of mandating masking have been the topics of widespread and often vehement public debate, dividing citizens, families, and elected officials. Like most public controversies, this one has made its way into the courts.

Not surprisingly, feelings have run most passionately when the controversy has involved children. As has been the case elsewhere in the nation, impassioned debate broke out throughout our state regarding whether schoolchildren should have to wear masks in school. In June, 2020, the defendants, the state Department of Education (department), then state Commissioner of Education Miguel A. Cardona, and Governor Ned Lamont, undertook to mandate that our state's schoolchildren wear masks while in school. It is the defendants' authority to implement that mandate, and to continue it for nearly two years, that forms the basis of the plaintiffs' present action, and it is the relatively recent repeal of that mandate that demands that we determine whether we still have jurisdiction over this appeal. We conclude that this case is moot and therefore dismiss the appeal for lack of jurisdiction.

I

The record contains the following relevant facts and procedural history, including background that we recently detailed at length in *Casey* v. *Lamont*, 338 Conn. 479, 258 A.3d 647 (2021). Like the present action, *Casey* involved a challenge to the governor's authority under General Statutes § 28-9.[1] "On March 10, 2020, [i]n response to the global pandemic of [COVID-19], Governor Lamont declare[d] a public health emergency and civil preparedness emergency throughout the [s]tate, pursuant to [General Statutes §§] 19a-131a and 28-9 . . . . Governor Lamont has renewed the declaration of both emergencies" several times. (Internal quotation marks omitted.) Id., 483–84. In his original declaration of March 10, 2020, Governor Lamont (governor) announced that he would issue executive orders "to protect public health and safety, including suspension or modification of specific statutes . . . as [he] determine[d] to be necessary." Although each order was limited to a six month period, as required by § 28-9 (b) (1), the governor renewed the declarations of both

emergencies multiple times. See *Casey* v. *Lamont*, supra, 483–84.

Days after declaring the public health emergency in March, 2020, the governor issued an executive order temporarily cancelling all in-person public school classes. See Executive Order No. 7C, § 1 (March 15, 2020). In May, 2020, the governor cancelled in-person classes for the remainder of the 2019–2020 school year. See Executive Order No. 7II, § 1 (May 5, 2020). In June, 2020, the department published a document titled "Plan for Reimagining CT Classrooms for Continuous Learning," which was subsequently updated in September, 2020, and retitled "Adapt, Advance, Achieve: Connecticut's Plan to Learn and Grow Together" (AAA), which provided guidance to school districts as they planned to reopen schools in the fall of 2020. The AAA contained certain requirements that were defined as "elements that the Office of the Governor, the [department], and/or the [state Department of Public Health] have identified as necessary for [school districts] to complete or comply with in order to open schools successfully [that] fall," including that all school districts adopt policies requiring students and staff to wear a mask or other form of face covering while on school property. The AAA provided limited exceptions to this mandate.[2]

In September, 2020, the governor issued Executive Order No. 9, which granted the Commissioner of Education (commissioner) authority to "issue binding guidance, rules, or orders for operation of schools . . . deem[ed] necessary to respond to the COVID-19 pandemic . . . . Such rules or binding guidance may include rules related to the required use of masks or face-coverings in school buildings . . . ." Executive Order No. 9, § 1 (September 4, 2020). The order excluded the commissioner's "binding guidance" from the definition of "regulation" for purposes of General Statutes § 4-166 (16) of the Uniform Administrative Procedure Act (UAPA). This exemption allowed the defendants to issue and enforce binding guidance without first providing notice to the public and an opportunity to be heard. The governor directed that this executive order would apply retroactively to the previously issued AAA and any addendums or amendments. After Executive Order No. 9 was issued in September, 2020, the governor extended it several times. During the pendency of this appeal, the department updated the AAA for the 2021–2022 school year, retaining the mask requirement.

Less than one month before Executive Order No. 9 was issued, the plaintiffs[3] filed this lawsuit, challenging the school mask mandate in the AAA and seeking declaratory and injunctive relief.[4] Subsequently, the parties filed motions for summary judgment.[5] The trial court granted the defendants' motion for summary judgment as to the third, fourth, fifth, and sixth counts

of the plaintiffs' complaint. The trial court reserved decision on the first two counts pending this court's decision in *Casey* v. *Lamont*, supra, 338 Conn. 479.

We subsequently released our decision in *Casey*. The plaintiffs in that case had challenged the legality of several executive orders that the governor issued during the beginning of the COVID-19 pandemic, "limit[ing] various commercial activities at bars and restaurants throughout the state." Id., 483. The plaintiffs argued that these executive orders exceeded the governor's statutory and constitutional authority. Id., 486. The trial court rejected the plaintiffs' arguments, and this court affirmed the trial court's judgment, holding, first, that, as a matter of statutory interpretation, the COVID-19 pandemic constituted a "serious disaster" under § 28-9 (a), authorizing the governor to declare a civil preparedness emergency pursuant to that statute. (Internal quotation marks omitted.) Id., 498. Second, we held that, "following the proclamation of a civil preparedness emergency pursuant to § 28-9 (a), subsection (b) (1) [as well as subsection (b) (7)] empowers the governor to modify or suspend any statute, regulation or requirement that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health" and that "[a]ll of the challenged executive orders fall squarely within either or both of these provisions." Id., 499.

As to the plaintiffs' constitutional claim, we held in *Casey* that "the plaintiffs [had not met] their heavy burden of establishing that [§ 28-9 (b) (1) violated] the separation of powers provision of article second of the Connecticut constitution on the [ground] that it impermissibly delegates legislative authority to the governor." Id., 505. We reasoned that, in enacting § 28-9, the General Assembly had established a clear policy for the governor to follow in the case of a serious disaster, as well as clear standards limiting the governor's authority to act. See id., 507–508. As such, we held that, although § 28-9 "affords the governor considerable latitude . . . that latitude is neither standardless nor limitless." (Citation omitted.) Id., 517.[6]

Following the release of *Casey*, the trial court granted the defendants' summary judgment motion on the remaining counts of the plaintiffs' complaint, concluding that "[t]here can be little doubt that, between the *Casey* [decision] and the General Assembly's action . . . [intelligible] principles and oversight exist and have been strengthened. This means [the trial] court must deem the governor's actions within his rights under the Connecticut constitution." Although the trial court did not specify why it granted the motion for summary judgment on the count of the complaint alleging that the governor's declarations were in violation of the UAPA, the court had stated in its previous decision that that claim would "[have] no foundation" if

this court were to uphold the legality of Executive Order No. 9 in *Casey*. With its latter ruling, the trial court had therefore rejected each of the plaintiffs' arguments. The plaintiffs then appealed to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

## II

The plaintiffs' lawsuit challenges the legality of the defendants' school mask mandate and seeks declaratory and injunctive relief. The plaintiffs have raised four claims on appeal. The first three are procedural in nature, while the last claim challenges the substance of the mask mandate itself, alleging that it harms schoolchildren. The plaintiffs first claim that the department improperly issued the school mask mandate without complying with the procedural requirements of the UAPA and that the governor's execution of Executive Order No. 9 could not cure this violation retroactively. Second, the plaintiffs ask us to address an issue we declined to reach in *Casey*: how long a governor may continue to renew declarations of civil preparedness emergencies and extend executive orders that modify or suspend statutes and regulations. See *Casey* v. *Lamont*, supra, 338 Conn. 507–508 n.11. Specifically, the plaintiffs claim that the governor improperly extended Executive Order No. 9 multiple times and that the civil preparedness emergency statute, § 28-9, does not permit the governor to renew executive orders that suspend statutes for longer than six months. Third, they claim that No. 22-1 of the 2022 Special Acts (S.A. 22-1), the basis for the governor's latest renewal of Executive Order No. 9,[7] unconstitutionally delegates legislative power to the Executive Branch in violation of both the separation of powers provision set forth in article second of the Connecticut constitution and the social compact clause of article first, § 1, of the Connecticut constitution. Finally, the plaintiffs claim that the mask mandate violates schoolchildren's rights to the free public education guaranteed by article eighth of the Connecticut constitution because it places them at risk of physical harm and impairs their education.

The department repealed the school mask mandate on March 7, 2022, while this appeal was pending. See State of Connecticut, State Board of Education, Letter to Superintendents and Private/Independent School Administrators (March 7, 2022). Soon after the mandate was repealed, the defendants moved this court to dismiss the plaintiffs' appeal as moot.

"[M]ootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve" before we may reach the merits of an appeal. (Internal quotation marks omitted.) *In re Emma F.*, 315 Conn. 414, 423, 107 A.3d 947 (2015). "It is a [well settled] general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is

not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal." (Internal quotation marks omitted.) Id.

The plaintiffs do not argue that their appeal and the underlying action still constitute a live controversy, and we agree with the defendants that this court can no longer provide the plaintiffs with any practical relief. See, e.g., *Connecticut Coalition Against Millstone* v. *Roque*, 267 Conn. 116, 124–25, 836 A.2d 414 (2003). Instead, the plaintiffs oppose the defendants' motion to dismiss this appeal and urge us to reach the merits of this case by relying on two exceptions to the mootness doctrine: "capable of repetition, yet evading review" and "voluntary cessation." We are not persuaded that either exception applies and therefore dismiss this appeal for lack of subject matter jurisdiction.

A

"The mootness doctrine does not preclude a court from addressing an issue that is capable of repetition, yet evading review. . . . [F]or an otherwise moot question to qualify for review under the capable of repetition, yet evading review exception, it must meet three requirements. First, the challenged action, or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot." (Internal quotation marks omitted.) *Burbank* v. *Board of Education*, 299 Conn. 833, 839–40, 11 A.3d 658 (2011).

The defendants do not contest that the issues the plaintiffs raise are of " 'some public importance.' " In fact, they could not credibly maintain that an action concerning the governor's authority to issue and extend executive orders of the nature involved in the present case during a civil preparedness emergency is not of the utmost public importance. Therefore, we have no trouble concluding that the third requirement of the applicable standard is satisfied.

Although we assume, without deciding, that the present appeal meets the first requirement of the capable of repetition, yet evading review exception, often referred to as the "durational requirement," we con-

clude that the second requirement is dispositive of this appeal because, under our precedents, there is not "a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act as a surrogate." (Internal quotation marks omitted.) *Earl B.* v. *Commissioner of Children & Families*, 288 Conn. 163, 170, 952 A.2d 32 (2008). This condition has two components: "(1) whether the question presented will recur at all; and (2) whether the interests of the people likely to be affected by the question presented are adequately represented in the current litigation." *Loisel* v. *Rowe*, 233 Conn. 370, 384, 660 A.2d 323 (1995). The first component is not met if there is a mere possibility that the question will recur. See *Russo* v. *Common Council*, 80 Conn. App. 100, 110, 832 A.2d 1227 (2003) ("*Loisel* does not provide an exception to the mootness doctrine when it is merely possible that a question could recur" (emphasis omitted)).

In addressing this second requirement, the parties frame the issues too narrowly by focusing solely on whether the mask mandate itself is likely to be reinstated. The appropriate inquiry is whether there is a "reasonable likelihood" that the particular governmental actions the plaintiffs challenge will arise in a similar manner in the future. This requires the court to consider what the party is "directly challenging," not the event that the appeal arises from. *In re Priscilla A.*, 122 Conn. App. 832, 838, 2 A.3d 24 (2010). The first three of the plaintiffs' claims on appeal challenge the defendants' enactment and extension of the school mask mandate, not the mandate itself. Therefore, we must consider the governmental actions the plaintiffs challenge (i.e., the department's alleged UAPA violation, the governor's issuance of executive orders under § 28-9 (b) (1), and the General Assembly's alleged unconstitutional delegation of legislative power to the Executive Branch), not the outcome of those actions (i.e., the mask mandate).

Whether the mask mandate is reasonably likely to be reinstated is relevant only to the plaintiffs' final claim: that the mask mandate violates schoolchildren's rights to a free public education. We will address each of the plaintiffs' challenges in turn to determine if any of them meet the second requirement of the capable of repetition, yet evading review exception to the mootness doctrine.[8]

The plaintiffs' first claim that the department violated the UAPA by issuing the mask mandate through the AAA. Given the unique nature of the COVID-19 pandemic, and the lack of precedent for how to address such a widespread and prolonged health emergency, it is purely speculative that, in the case of a future civil preparedness emergency, the department will issue any necessary guidance in the same way it did in 2020. In

particular, after the department issued the AAA guidance, the governor issued Executive Order No. 9, which, among other things, exempted the department's "binding guidance" from the definition of "regulation" in the UAPA. See General Statutes § 4-166 (16). In turn, this gave rise to the plaintiffs' argument in this lawsuit that the governor could not cure the claimed UAPA violation retroactively. We consider it unlikely that, when the department faces a similar civil preparedness or health emergency in the future, it will issue binding guidance, such as the mask mandate, by employing the same procedure that the plaintiffs have challenged. See *Russo* v. *Common Council*, supra, 80 Conn. App. 110 (although defendants did not concede that their actions in establishing town's mill rate were improper, "there . . . [was] no indication that there is a reasonable likelihood the defendants plan[ned] to use that method in the future"). As counsel for the defendants indicated at oral argument before this court, although it is "possible" that this could recur, that possibility does not rise to the level of a reasonable likelihood. The circumstances facing the defendants early in the pandemic cannot be replicated. Prior to March, 2020, there was no clear guidance as to how the Legislative and Executive Branches could or should respond to a pandemic of this magnitude. With newly acquired knowledge borne of experience, the defendants are unlikely to address future civil emergencies, including those that might arise out of the current pandemic, in the same way.

The plaintiffs' second claim is that the governor unlawfully extended Executive Order No. 9 multiple times. They argue that § 28-9 does not permit the governor to renew his declaration of a civil preparedness emergency or the executive orders promulgated under that declaration. Once again, it is entirely speculative that the state, the nation, or the world will experience another pandemic of the same extended nature or that a governor will employ the same procedure in a future emergency. Indeed, since the filing of this action, the General Assembly has taken steps to validate the governor's issuance and extension of executive orders under § 28-9. No. 21-2 of the 2021 Special Acts (S.A. 21-2) authorized the governor to renew orders issued pursuant to his earlier emergency declarations and No. 21-5 of the 2021 Special Acts (S.A. 21-5) extended that authority. Special Act 21-5, § 2 (a) (2), required that a majority of both houses of the General Assembly approve the governor's renewals, and § (2) (b) provided a method for a joint legislative committee to disapprove of these extensions. Special Act 22-1, § 1 (c) (1), extended Executive Order No. 9 through June 30, 2022, and authorized the department to rescind the school mask mandates after February 28, 2022. Especially in light of legal challenges to actions the governor undertook during this pandemic, the General Assembly now has the knowledge and experience to determine

whether to validate or nullify executive orders that might be issued in a hypothetical future emergency of the same magnitude or length. See *Darien* v. *Estate of D'Addario*, 258 Conn. 663, 679–80, 784 A.2d 337 (2001) ("town's argument that the referendum outcome [did] not preclude it from revisiting the issue simply [meant] that if and when the town [did] revisit the issue, there [would] be a case in controversy for our consideration at that time").

The plaintiffs' third claim is that the General Assembly unconstitutionally delegated legislative power to the governor by passing multiple special acts ratifying the governor's declarations of an emergency and allowing him to extend those declarations. See, e.g., S.A. 22-1; S.A. 21-5; S.A. 21-2. As previously discussed, it is entirely speculative that a pandemic of this magnitude and duration will occur in the future. A majority of civil preparedness emergencies declared in Connecticut prior to the COVID-19 pandemic were issued in response to far less long-lasting natural disasters and severe weather conditions. See, e.g., Governor Dannel P. Malloy, Executive Order No. 43 (January 26, 2015) (noting that "a civil preparedness proclamation was issued by the [g]overnor on January 26, 2015, due to the severe weather conditions predicted to affect the state"); Governor Dannel P. Malloy, Executive Order No. 33 (March 18, 2013) (ending civil preparedness emergency declared in response to severe weather caused by Hurricane Sandy in 2012). Although the exact duration of our state's previous civil preparedness emergencies is difficult to ascertain, it is reasonable for this court to assume that, because they are often weather related, most civil preparedness emergencies last only a few weeks or months. Therefore, it is unlikely that the legislature will be confronted with a similar emergency in which the governor seeks to extend his emergency powers beyond what this court in *Casey* held did not violate the separation of powers doctrine. See *Casey* v. *Lamont*, supra, 338 Conn. 505. If there is such an occasion, and given the most recent court challenges to those extensions, we have confidence that a plaintiff will be able to reach this court with a live case, including by enlisting the help of the appellate courts, up to and including the Chief Justice. See General Statutes § 52-265a (allowing for public interest appeal upon certification by Chief Justice); Practice Book § 83-2 (specifying procedure for filing public interest appeal); see also Practice Book § 73-1 (allowing parties to reserve questions of law for consideration by appellate courts).

The plaintiffs' final claim is that the mask mandate violates schoolchildren's rights to a free public education. Because there are currently no mask mandates in the state, it is entirely speculative that the defendants will issue another school mask mandate. Since the repeal of the mandate in February, 2022, neither the

governor nor the department has indicated an intention to reinstate the mandate. To conclude that there is a reasonable likelihood that a school mask mandate will be reinstated would require this court to predict the future trajectory of the current pandemic as well as how the political branches will respond to a return of more severe conditions or increased risk of contagion. We agree with several federal courts that have held that repealed COVID-19 restrictions render a case moot and that a finding that an exception applies "would require both scientific and political speculation—i.e., that the pandemic will proceed in a particular way, and that [the] political branches will decide to reimpose the particular restrictions challenged in [the] case." (Internal quotation marks omitted.) *Hinkle Family Fun Center, LLC* v. *Grisham*, 586 F. Supp. 3d 1118, 1138 (D.N.M. 2022) (quoting *Let Them Play MN* v. *Walz*, 556 F. Supp. 3d 968, 978–79 (D. Minn. 2021)), aff'd, United States Court of Appeals, Docket No. 22-2028 (10th Cir. December 28, 2022); see also *Butler* v. *Governor*, 8 F.4th 226, 231 (3d Cir. 2021) (although secretary of health of commonwealth of Pennsylvania retained power to issue pandemic related orders subsequent to expiration of orders challenged on appeal, case was still moot), cert. denied sub nom. *Butler County* v. *Wolf*,      U.S.     , 142 S. Ct. 772, 211 L. Ed. 2d 482 (2022); *Spell* v. *Edwards*, 962 F.3d 175, 180 (5th Cir. 2020) (it was "speculative, at best" that governor would reimpose same or similar restriction); cf. *Johnson* v. *Governor*, Docket No. 21-1795, 2022 WL 767035, *3 (3d Cir. March 14, 2022) ("[t]he mere power to reenact a challenged law is not enough" to come within the exception (internal quotation marks omitted)). Therefore, we conclude that, under our precedents, the plaintiffs have failed to prove that their claims are capable of repetition, yet evading review.

B

The plaintiffs also argue that the voluntary cessation exception to the mootness doctrine should prevent us from dismissing this appeal. Specifically, they argue that the defendants have not demonstrated that their " 'allegedly wrongful behavior' " will not recur. The defendants respond that the voluntary cessation doctrine does not apply because the cessation of the mask mandate was "not 'taken for the deliberate purpose of evading a possible adverse decision . . . .' " Alternatively, they argue that, if the doctrine applies, the school mask mandate cannot reasonably be expected to be reinstated. We agree with the defendants that the requirements of the exception are not satisfied.

We have seldom had reason to address the voluntary cessation exception to the mootness doctrine. As between private parties, and relying on case law involving private parties, we have stated that, "a defendant's voluntary cessation of a challenged practice does not deprive a . . . court of its power to determine the legal-

ity of the practice, because, [i]f it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways." (Internal quotation marks omitted.) *Boisvert* v. *Gavis*, 332 Conn. 115, 139–40, 210 A.3d 1 (2019). We went on to state in *Boisvert* that "the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent, and a case becomes moot only if subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. . . . The heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." (Citation omitted; internal quotation marks omitted.) id., 140; see also *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 281–82, 933 A.2d 256 (2007) (holding that defendant's voluntary cessation of plans to develop lot did not render case moot, as developer had "not alleged, much less established, that it [did] not intend to resume any development activity on the . . . lot . . . [and] the plaintiffs . . . could obtain [injunctive] relief . . . that would apply to any future work on the . . . lot").

When governmental actors have voluntarily ceased the conduct alleged to have been unlawful, however, we have determined that some deference is appropriate. For example, in *St. Pierre* v. *Solnit*, 233 Conn. 398, 658 A.2d 977 (1995), inpatients at a state hospital challenged a no-smoking policy in certain facilities that was implemented as an unadopted regulation by the Commissioner of Mental Health. Id., 399–400. Just after the plaintiffs filed their complaint in the trial court, the Commissioner of Mental Health revised the no-smoking policy. Id. Although the plaintiffs "acknowledge[d] that the . . . revised policy provide[d] them with the substantive relief that they sought in their complaint," they claimed "that they continue[d] to have the right to challenge the validity of the superseded" policy, citing *Loisel* for the capable of repetition, yet evading review exception to the mootness doctrine. Id., 401. Rebuffing the plaintiffs' argument that the "possibility that the Commissioner [of Mental Health] unilaterally will reinstate the superseded smoking policy" sufficed to bring the appeal within a mootness exception, this court agreed that "[v]oluntary cessation by a party free to resume the challenged activity . . . will not automatically shield a claim for an injunction against that very activity from review." Id., 402. However, this court relied on the representations of the Deputy Commissioner of Mental Health that "[t]he Department [of Mental Health did] not anticipate reinstatement" of the policy, which "would prohibit smoking by inpatients in Department [of Mental Health] buildings"; id., 400 n.3; and was "persuaded that there [was] no reasonable expectation" that the challenged policy would be reinstated. Id., 402.

The deference that *St. Pierre* gave to governmental actions is consistent with that given in numerous federal court decisions. As our state jurisprudence on the voluntary cessation exception is scant, we find federal law persuasive. For example, when applying this doctrine to governmental actions, the United States Court of Appeals for the Second Circuit recognized that "some deference must be accorded to a legislative body's representations that certain conduct has been discontinued . . . ." (Internal quotation marks omitted.) *Mhany Management, Inc.* v. *Nassau*, 819 F.3d 581, 604 (2d Cir. 2016). Official government action to rescind a challenged policy also "lends force to the representation that in the future the violation will not recur." *Saba* v. *Cuomo*, 535 F. Supp. 3d 282, 296 (S.D.N.Y. 2021). This does not constitute a guarantee of " 'unquestioned acceptance' " of governmental representations. Id., 297. Rather, under some circumstances, courts must consider when the challenged behavior ceased and whether it appears to "track" the litigation. *Mhany Management, Inc.* v. *Nassau*, supra, 604; see id. (noting "suspicious timing and circumstances" surrounding defendant's cessation of challenged activity that appeared to "track the development of [the] litigation"); see also *Litowitz* v. *Garland*, Docket No. 3:20-cv-724 (AWT), 2021 WL 3679144, *5 (D. Conn. August 19, 2021) (recognizing that defendant's cessation of challenged policy occurred only two months after litigation commenced in United States District Court and that there were "inconsistent messages" from leadership regarding whether policy would be reinstated in future).

The "found[ing] . . . principle [of the voluntary cessation doctrine is] that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." (Internal quotation marks omitted.) *Boisvert* v. *Gavis*, supra, 332 Conn. 139. This exception applies especially to parties who cease the challenged behavior for the purpose of avoiding litigation. See, e.g., *Hartnett* v. *Pennsylvania State Education Assn.*, 963 F.3d 301, 307 (3d Cir. 2020) (rather than being an exception to mootness, "[v]oluntary cessation is just a recurring situation in which courts are particularly skeptical of mootness arguments"). Therefore, when considering whether to apply the voluntary cessation exception in a particular case, the court must consider when and why a party ceased the challenged action.

The plaintiffs argue that, unless we opine on the legality of the mask mandate, the defendants "will . . . revert to the very conduct that [the plaintiffs] are challenging to cope with new COVID-19 variants." This is pure speculation. The defendants have expressed—both publicly and before this court—that they repealed the mandates because the circumstances of the pandemic had changed.[9] This court has no reason to disbe-

lieve those statements, and, significantly, the plaintiffs do not suggest that the defendants' motivation was to avoid an adverse decision. See *Feehan* v. *Marcone*, 331 Conn. 436, 468, 204 A.3d 666 (courts must presume that state officials "act in good faith and in sincerity of purpose in the execution of [their] duties" (internal quotation marks omitted)), cert. denied,     U.S.    , 140 S. Ct. 144, 205 L. Ed. 2d 35 (2019). Indeed, the mask mandate remained in place for eighteen months after the plaintiffs filed this lawsuit, and, since its repeal in March, 2022, the defendants have not suggested that they plan to reinstate it. There currently is no state mask mandate, in schools or elsewhere. The record is bereft of any evidence that the defendants repealed the mandate in response to litigation or with the intent to reinstate the policy after a dismissal of this appeal.

The plaintiffs further argue that the defendants have not met their heavy burden of proving that it is absolutely clear that they will not reinstate the mask mandate. However, the plaintiffs' fear is rooted in an assumption that the circumstances of the current pandemic will worsen or that a new pandemic will occur. This concern is more appropriately addressed in our application of the capable of repetition, yet evading review standard. Because we accept the defendants' representations that they did not repeal the mandate to avoid litigation and that there is no current intention to reinstate the mandate, we cannot conclude that their conduct is "reasonably expected" to recur. We therefore conclude that the voluntary cessation exception does not apply to overcome the admitted mootness of the controversy in this case.

### III

Our conclusion that this appeal has become moot may be viewed as anticlimactic given the passions brought to the public controversy that led to what was once a live, legal dispute, as well as the resources devoted to prosecuting and defending this action. Disappointment in this outcome can lead to claims that the court is " 'ducking' " important issues; *Naylor* v. *Superior Court*, 558 F.2d 1363, 1366 (9th Cir. 1977), cert. denied, 435 U.S. 946, 98 S. Ct. 1530, 55 L. Ed. 2d 544 (1978); see id. ("[m]ootness is not merely a 'ducking device' "); or shirking our constitutional responsibility. See *Hornbeck Offshore Services*, *L.L.C.* v. *Salazar*, 396 Fed. Appx. 147, 148 n.3 (5th Cir. 2010) ("[a]s to the . . . charge that our decision 'shirks' our judicial responsibility, we are decidedly unpersuaded that one of this court's duties is to render judgment on matters that are not before us"). Less cynically, the plaintiffs' counsel in the present case implores us to recognize that there is a need for us to police the proper boundaries of constitutional power among the branches of government. Notwithstanding these understandable sentiments, we are resolved to resist the temptation to opine

on issues concerning the emergency powers of another branch of government when the need for our opinion has passed.

Through the federal and state constitutions, the citizens of this nation and this state have created courts to resolve disputes in a civilized manner. See U.S. Const., art. III, § 1; Conn. Const., art. V, § 1; see also *Thompson* v. *Washington*, 497 F.2d 626, 634 (D.C. Cir. 1973) (describing "importance of courts in the resolution of disputes in a civilized society"). These constitutions—state and federal—establish the judiciary as a separate branch of government, both for resolving conflicts between citizens and as a check on the other two branches of government. See *Casey* v. *Lamont*, supra, 338 Conn. 503 ("[t]he constitution . . . prescribe[es] limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers" (internal quotation marks omitted)). Citizens and taxpayers have sufficient confidence in the judicial branches of government that they tolerate being taxed for, and permit their elected representatives to fund, this system of justice. It is important enough to the people of Connecticut particularly that our courts should be available to resolve disputes, including those brought by persons claiming aggrievement as a result of the actions of their government, that they have enshrined this value in the open courts provision of our state constitution. See Conn. Const., art. I, § 10;[10] see also *Sabino* v. *Ruffolo*, 19 Conn. App. 402, 408, 562 A.2d 1134 (1989) ("Connecticut's constitution specifically assures the citizens under its protection that the state's courts will be open for the resolution of their disputes").

It is well understood that Connecticut courts, like the federal courts, limit themselves to ruling on cases or controversies. See, e.g., *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 730, 95 A.3d 1031 (2014). However, because "our state constitution contains no 'case or controversy' requirement like that found in article three of the United States [c]onstitution"; *Connecticut Assn. of Health Care Facilities, Inc.* v. *Worrell*, 199 Conn. 609, 613, 508 A.2d 743 (1986); unlike the federal courts, we do not concern ourselves with the question of whether our jurisdictional principles—e.g., standing, ripeness, mootness and political question—derive from the constitution itself or from prudential considerations. Cf. E. Chemerinsky, "A Unified Approach to Justiciability," 22 Conn. L. Rev. 677, 691–92 (1990). Rather, the jurisdictional boundaries of our courts, including "[o]ur mootness jurisprudence," have "evolved under our common law." *State* v. *McElveen*, 261 Conn. 198, 212, 802 A.2d 74 (2002).[11]

Practically, this means that Connecticut courts will rule only on live controversies—i.e., those in which the parties before us require resolution. Cf. *Wendy V.* v.

*Santiago*, 319 Conn. 540, 544–45, 125 A.3d 983 (2015) ("[A]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.)). Like the federal courts, "[w]e do not give advisory opinions"; we do not "sit as roving commissions assigned to pass judgment on the validity of legislative enactments" (internal quotation marks omitted) *Bell Atlantic Mobile, Inc.* v. *Dept. of Public Utility Control*, 253 Conn. 453, 490, 754 A.2d 128 (2000); and we "do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities." *Transunion LLC* v. *Ramirez*,      U.S.     , 141 S. Ct. 2190, 2203, 210 L. Ed. 2d 568 (2021).

Reticence under these circumstances is borne of sound judicial policy. First, we ensure "that judicial decisions [that] may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) *State* v. *McElveen*, supra, 261 Conn. 204. And even when, as in the present case, we have little reason to doubt the temperature of the controversy, when the case implicates the actions of the legislature or the executive, prudence counsels that we "limit the role of the unelected judiciary and . . . minimize oversight of the other branches of government." E. Chemerinsky, supra, 22 Conn. L. Rev. 693–94. In cases such as the present one, this "recognized policy of self-restraint" is also consistent with "the basic judicial duty to eschew unnecessary determinations of constitutional questions." *Negron* v. *Warden*, 180 Conn. 153, 166, 429 A.2d 841 (1980). Confidence and trust in our courts—by the parties and the public—are critical to our judiciary's continued credibility. That confidence and trust can be undercut by a court too reticent to act in the face of a live and "hot controversy." So, too, can it be undercut by a court too eager to jump into such a fray.

Thus, our charge is to resolve only live disputes, no matter how interesting the moot issues presented might be to us or to the parties before us, or how important the case might have been at an earlier time. To do otherwise risks embroiling our courts in imagined controversies or those already resolved, along with uselessly expending judicial resources better put to resolving other parties' cases. See, e.g., Note, "The Mootness Doctrine in the Supreme Court," 88 Harv. L. Rev. 373, 376 (1974).

The political branches have repealed the mask mandate at issue, and any opinion we might provide regarding the legality of such a moot controversy might appear, unnecessarily, either to weaken or to fortify the authority of those branches. This is to be avoided.

Should circumstances revive the controversy that prompted the plaintiffs' lawsuit or give rise to controversies like it, our courts—including this court—have shown that they are capable of hearing and ruling on the matter with alacrity when conditions dictate and when called on by the parties to do so.[12]

The appeal is dismissed.

In this opinion the other justices concurred.

* January 12, 2023, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 28-9 provides in relevant part: "(a) In the event of serious disaster, enemy attack, sabotage or other hostile action or in the event of the imminence thereof, the Governor may proclaim that a state of civil preparedness emergency exists . . . .

"(b) . . . (1) Following the Governor's proclamation of a civil preparedness emergency pursuant to subsection (a) of this section or declaration of a public health emergency pursuant to § 19a-131a, the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. The Governor shall specify in such order the reason or reasons therefor and any statute, regulation or requirement or part thereof to be modified or suspended and the period, not exceeding six months unless sooner revoked, during which such order shall be enforced. . . ."

[2] The AAA stated that masks should not be required for "anyone who has trouble breathing, or anyone who is unconscious, incapacitated or otherwise unable to remove the mask without assistance," or for "anyone who has a medical reason making it unsafe to wear" a mask. The AAA also permitted exceptions for students with special needs and speech therapy, for teachers who teach class sufficiently distanced from their students, for students while outside, and for "mask breaks throughout the day."

[3] Along with CT Freedom Alliance, LLC, the plaintiffs include four parents (Jenna Matos, Michelle Crawford, Raena Ferguson, and Ruth Brignatti) individually and as next friends of their respective children.

[4] The plaintiffs' amended complaint contained the following six counts: (1) the promulgation of the AAA mask mandate violated the notice and comment requirements contained in General Statutes § 4-168 of the UAPA; (2) the governor lacked authority to issue Executive Order No. 9 because the COVID-19 pandemic does not qualify as a "serious disaster" within the meaning of § 28-9, and the governor's actions pursuant to § 28-9 are unconstitutional under the separation of powers provision contained in article second of the Connecticut constitution; (3) the AAA places an unconstitutional burden and restriction on the rights of the plaintiffs' children to a free and public education under article eighth of the Connecticut constitution; (4) the AAA violates the plaintiffs' procedural due process rights under the fifth and fourteenth amendments to the United States constitution; (5) the AAA mandate violates the social compact clause of article first, § 1, of the Connecticut constitution; and (6) the issuance of the AAA was negligent because it was "likely" to cause harm to public school students.

[5] In their motion for summary judgment, the defendants argued that, as to count one of the plaintiffs' amended complaint, Executive Order No. 9 mooted the claim that the department's promulgation of the mask mandate violated the UAPA. Alternatively, the defendants argued that, even if Executive Order No. 9 did not validate the issuance of the mask mandate, the governor's Executive Order 7BB already required all persons to wear masks in public places, and, therefore, the AAA "did not constitute a prescription or interpretation of a law or policy." See Executive Order No. 7BB (April 17, 2020). As to counts two and five of the amended complaint, which challenged the legality of Executive Order No. 9 on statutory and constitutional grounds, the defendants argued that (1) this court's preliminary ruling in *Casey* upheld the trial court's determination that the pandemic was a "serious disaster" within the plain meaning of § 28-9, and (2) the social compact clause of article first, § 1, of the Connecticut constitution is irrelevant to the case. As to count three, in which the plaintiffs claimed that the mask provisions of the AAA are facially unconstitutional under article eighth

of the Connecticut constitution, the defendants argued that, even if it is assumed that there was a disputed issue of fact as to whether masks are harmful to schoolchildren, the plaintiffs' facial challenge fails as a matter of law because (1) whether to require masks is a policy choice courts are unable to question, (2) the mandate could not violate all children's rights to a public education because there are exceptions, and (3) the mandates are justified by a compelling governmental interest. As to count four of the amended complaint, in which the plaintiffs alleged that the AAA places an unconstitutional burden and restriction on the rights of the plaintiff children to a free and public education under article eighth of the Connecticut constitution, the defendants argued that it is improper to bring a facial, procedural due process claim, and, therefore, this claim fails as a matter of law. Finally, as to count six, in which the plaintiffs alleged a claim of negligence, the defendants argued that they are entitled to sovereign immunity against common-law negligence claims.

By contrast, in their own summary judgment motion, the plaintiffs argued that, as to count one, the defendants did not comply with the statutory requirements for promulgating a regulation, and, therefore, the AAA violated General Statutes § 4-168 of the UAPA as a matter of law. As to count two, the plaintiffs argued that the COVID-19 pandemic did not constitute a "serious disaster," and, therefore, the governor lacked the statutory authority to declare a civil preparedness emergency and to extend that emergency. As to count three, the plaintiffs argued that, as a matter of law, when the state adopts a policy that allegedly harms children, their right to a free public education is violated as a matter of law. The plaintiffs argue that, as to count four, they had the constitutional right to be heard before the promulgation of a regulation, and, therefore, the publication of the AAA without an opportunity to be heard violated their due process rights. As to count five, the plaintiffs argued that § 28-9 violates the social compact clause of article first, § 1, of the Connecticut constitution on its face because it delegated "all of the legislative power" to the Executive Branch. The plaintiffs did not make an argument in support of summary judgment on their common-law negligence claim, and we note that this claim is not one for personal injury damages, as the plaintiffs have not claimed damages in their complaint.

[6] Since the release of *Casey*, the General Assembly has taken additional steps to oversee the governor's renewal of his emergency declarations and executive orders. During its January, 2021 session, the General Assembly passed Nos. 21-2, 21-4 and 21-5 of the 2021 Special Acts, which ratified the governor's actions during the pandemic and authorized him, subject to oversight by a legislative committee, to extend the civil preparedness emergency through March, 2022. These acts required the General Assembly to approve by resolution any of the governor's new declarations. In February, 2022, the General Assembly also extended the governor's emergency powers through June, 2022, by passing S.A. 22-1.

[7] At the time the parties filed their briefs, the plaintiffs challenged S.A. 21-5, which validated the governor's renewal of Executive Order No. 9 through February 15, 2022.

[8] Although we have assumed, without deciding, that the (first) durational requirement of the capable of repetition, yet evading review exception is met, we take this opportunity to clarify how we measure this requirement.

"The first element in the analysis pertains to the length of the challenged action . . . [and whether there are] functionally insurmountable time constraints" to full appellate review. *Loisel* v. *Rowe*, supra, 233 Conn. 383. To determine if an issue will evade review, this court has relied on the average length of the challenged action. See, e.g., *U.S. Bank National Assn.* v. *Crawford*, 333 Conn. 731, 749, 219 A.3d 744 (2019). Consistent with our approach to the second requirement, this requires the court to consider the average lifespan of the challenged action on appeal, not the individual harm alleged in the case. For example, in *State* v. *Boyle*, 287 Conn. 478, 487–88 n.3 949 A.2d 460 (2008), this court considered the possible length of the probationary period for all crimes, not just the crime of which the defendant had been convicted in that case. See also *U.S. Bank National Assn.* v. *Crawford*, supra, 748–49 (considering length of cases filed under chapter 13 of United States Bankruptcy Code, 11 U.S.C. § 1301 et seq. (2012), in general); *In re Emoni W.*, 305 Conn. 723, 732–33, 48 A.3d 1 (2012) (considering average length of time between order for study and approval *in all cases* from previous six years).

If we were to address the first requirement in the present case, this court would focus on the time limitations inherent in the governmental actions that the plaintiffs' challenge—the department's alleged violation of the UAPA,

the governor's issuance of executive orders under § 28-9 (b) (1), and the legislature's power to delegate legislative power to the Executive Branch. Only the plaintiffs' claim challenging the constitutionality of the mask mandate would require us to consider the duration of a mask mandate itself.

[9] In announcing the end of the mask mandate, the governor stated: "Connecticut is seeing a dramatic decline in cases caused by the Omicron variant, and children over the age of [five] have had the ability to get vaccinated for more than three months now. . . . With this in mind, I think we are in a good position to phase out the requirement that masks be worn in all schools statewide and shift the determination on whether to require this to the local level." (Internal quotation marks omitted.) ABC 7 Eyewitness News, Connecticut COVID omicron update: Gov. Lamont recommends dropping school mask mandate Feb. 28 (February 7, 2022), available at COVID Omicron CT Update: Gov. Lamont recommends dropping school mask mandate Feb. 28 - ABC7 New York (abc7ny.com) (last visited January 12, 2023).

[10] The constitution of Connecticut, article first, § 10, provides: "All courts shall be open, and every person, for an injury done him in his person, property or reputation, shall have remedy by course of law, and right and justice administered without sale, denial or delay."

[11] As such, although we often borrow from federal case law, our jurisdictional jurisprudence is our own. See *State* v. *McElveen*, supra, 261 Conn. 210 (reviewing federal mootness jurisprudence to inform court's application of collateral consequences doctrine). For example, our application of the capable of repetition, yet evading review standard varies slightly from the federal courts. "Although the phrase 'capable of repetition, yet evading review' comes from the United States Supreme Court case of *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S. Ct. 279, 55 L. Ed. 310 (1911), and was further developed by that court in *Weinstein* v. *Bradford*, 423 U.S. 147, 149, 96 S. Ct. 347, 46 L. Ed. 2d 350 (1975), we have historically exercised our authority to develop our own criteria for the application of this exception to mootness. Under federal law, the exception applies only [when] two elements combine: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and (2) in the absence of a class action, there was a reasonable expectation that the complaining party would be subjected to the same action again." *Loisel* v. *Rowe*, supra, 233 Conn. 379. Our courts have adopted as a third requirement that the question must have "some public importance . . . ." Id., 382. As to the voluntary cessation exception, although there is scant case law in Connecticut on this exception, our court's application of it is consistent with the underlying federal rationale, namely, that the "found[ing] . . . principle [of the voluntary cessation doctrine is] that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." (Internal quotation marks omitted.) *Boisvert* v. *Gavis*, supra, 332 Conn. 139; see also part II B of this opinion.

[12] We note that, in *Casey* v. *Lamont*, supra, 338 Conn. 479, less than seven months passed from the commencement of the parties' action to this court's announced judgment in a brief, per curiam ruling after oral argument. See id., 486, 488. Within that time, the parties tried the case, the trial court issued a written decision, the plaintiffs appealed, and we accepted briefs and heard oral argument. A full opinion by this court affirming the trial court's judgment in favor of the defendants followed approximately three months after our per curiam ruling. See id., 481, 488.

---