******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# THE UNITED ILLUMINATING COMPANY *v.*
# PUBLIC UTILITIES REGULATORY
# AUTHORITY
## (SC 20795)

McDonald, D'Auria, Mullins, Ecker, Alexander,
Dannehy and Alvord, Js.*

*Syllabus*

The plaintiff, U Co., an electric distribution company, appealed from the judgments of the trial court, which had dismissed its consolidated administrative appeals from two final decisions of the defendant, the Public Utilities Regulatory Authority (PURA). In one of its decisions, PURA found that U Co. had violated its statutory obligations in connection with its emergency planning, storm recovery performance, and other actions taken in response to an August, 2020 tropical storm, and announced its intention to impose a fifteen basis point reduction of U Co.'s authorized return on equity (ROE). In its other decision, PURA imposed more than $1.2 million in fines on U Co. pursuant to statute (§ 16-32i) for its violation of storm performance standards and $61,000 in additional civil penalties for U Co.'s failure to timely report two minor accidents that occurred in the aftermath of the storm, in violation of statute ((Rev. to 2019) § 16-16). On appeal, U Co. challenged the ROE reduction, as well as the fines and civil penalties imposed for U Co.'s violation of performance standards and its late reporting of the minor accidents. *Held*:

PURA's subsequent decision, made during the pendency of this appeal, not to implement the fifteen basis point ROE reduction rendered moot the issue of whether PURA lacked statutory authority to implement that ROE reduction, and neither the voluntary cessation nor the collateral consequences exception to the mootness doctrine applied.

The application of equitable remedy of vacatur to the portion of PURA's order authorizing the ROE reduction and to that portion of the trial court's judgment upholding that order was appropriate.

The failure to report a minor accident, as contemplated by § 16-16, did not qualify as a "continued violation" under the statute ((Rev. to 2019) § 16-41) governing the imposition of civil penalties on public service companies; rather, the requirement in § 16-16 that minor accidents be reported "once each month" meant that each monthly failure to timely report a minor accident constituted a single, distinct violation for purposes of § 16-41.

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Because PURA improperly treated U Co.'s delay in reporting the two minor accidents as a continued violation and imposed a $500 daily penalty for each unreported accident rather than a $500 penalty for each month in which U Co. failed to report each minor accident, the case was remanded to the trial court with direction to order PURA to recalculate those penalties.

There was sufficient evidence to support PURA's finding, in connection with its imposition of $1.2 million in fines, that U Co. had violated § 16-32i by failing to timely provide a dedicated make safe crew for the city of Bridgeport, and there was sufficient evidence to support PURA's additional finding that U Co.'s communications with Bridgeport officials regarding storm recovery efforts were at times inadequate.

Argued December 11, 2023—officially released October 29, 2024**

*Procedural History*

Appeal from, inter alia, the finding of the defendant that the plaintiff had failed to fully comply with previously established standards of acceptable performance of an electric distribution company after an emergency and a reduction of the plaintiff's authorized return on equity, and appeal from the defendant's imposition of civil penalties on the plaintiff, brought to the Superior Court in the judicial district of New Britain, where the court, *Klau, J.*, granted the motion to intervene filed by the Office of Consumer Counsel in each appeal; thereafter, the appeals were consolidated and tried to the court, *Cordani, J.*, which rendered judgments dismissing the appeals, from which the plaintiff appealed. *Appeal dismissed in part; vacated in part; reversed in part.*

*John W. Cerreta*, with whom were *Jeffrey R. Babbin* and, on the brief, *Michael L. Miller*, for the appellant (plaintiff).

*Seth A. Hollander*, assistant attorney general, with whom were *Scott Muska*, general counsel, and, on the brief, *William Tong*, attorney general, for the appellee (defendant).

** October 29, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*William E. Dornbos*, legal director, with whom, on the brief, were *Claire E. Coleman*, consumer counsel, and *Andrew W. Minikowski*, for the appellee (intervenor Office of Consumer Counsel).

*Opinion*

MULLINS, J. In this appeal, the plaintiff, The United Illuminating Company, appeals from the judgments of the Superior Court dismissing its consolidated administrative appeals from two final decisions of the defendant, the Public Utilities Regulatory Authority (PURA). The plaintiff challenges PURA's determination that the plaintiff had violated its statutory obligations with respect to its emergency planning, storm recovery performance, and other actions taken in August, 2020, in connection with Tropical Storm Isaias and its aftermath. The plaintiff further contends that PURA improperly reduced the plaintiff's authorized return on equity (ROE) and imposed various civil penalties, including more than $1.2 million in fines. We conclude that the plaintiff's challenge to the ROE reduction is moot, insofar as the reduction was never implemented. We also conclude that PURA miscalculated the fines it imposed for the plaintiff's delayed reporting of two minor accidents. Otherwise, we find no error and thus affirm the trial court's judgments in all other respects.

I

We begin with the relevant facts and procedural history, as set forth in the administrative record. In 2012, in the aftermath of Tropical Storm Irene and an October, 2011 snowstorm, the General Assembly enacted legislation directing PURA to establish standards of acceptable performance for electric distribution companies (EDCs) responding to certain emergencies. See Public Acts 2012, No. 12-148, § 3 (codified at General Statutes (Rev. to 2013) § 16-32h). The legislation directed PURA to investigate the EDCs' responses following such emer-

gencies and empowered PURA to impose civil penalties for noncompliance with performance standards. See Public Acts 2012, No. 12-148, § 4 (codified at General Statutes (Rev. to 2013) § 16-32i).

On August 4, 2020, Tropical Storm Isaias produced damage throughout nearly all of the plaintiff's service territory in southern Connecticut. Early in the storm recovery process, on August 6, 2020, the city of Bridgeport filed a motion with PURA to compel the plaintiff to undertake additional restoration action. Bridgeport requested that PURA take immediate action to force the plaintiff "to live up to its obligations as a 'public service company'" because, in its view, the plaintiff had "done little, if anything, to serve the public of Connecticut's largest city [during restoration of service in the aftermath of Tropical Storm Isaias]."

In the days following the storm, PURA initiated two proceedings addressing the plaintiff's storm preparation and response performance. The first proceeding (investigation proceeding) was a broadly scoped investigation concerning the plaintiff's actions before, during, and after the storm. In 2021, after a series of hearings, PURA issued a final decision in the investigation proceeding, finding that the plaintiff's response times for service restoration generally satisfied the performance standards that the plaintiff had adopted as part of its approved emergency response plan. PURA faulted the plaintiff, however, for deficiencies with respect to its make safe crews,[1] its responses to life-threatening situations and related emergencies, its duty

---

[1] A make safe crew consists of workers who are tasked with powering off downed power lines and physically disconnecting them from the grid to allow for the safe clearing of roadways. See Connecticut Emergency Support Function 12: All Hazards Energy and Utilities Annex (August, 2013) p. 31, available at https://portal.ct.gov/-/media/DEMHS/_docs/Plans-and-Publications/EHSP0061-SRF-ESF12--EnergyandUtilitiesAnnex.pdf (last visited October 28, 2024).

to timely report minor accidents, and its communication and coordination with municipalities. As a result, PURA ordered numerous modifications to the plaintiff's storm response protocols. PURA also announced its intention to impose a fifteen basis point reduction of the plaintiff's authorized ROE at the plaintiff's next regular rate case. According to PURA, this reduction was not a penalty but, rather, was meant as an incentive to "encourage [the plaintiff] to cure" management and operational deficiencies.

The second proceeding (penalty proceeding) was initiated so that PURA could consider appropriate civil penalties for the deficiencies identified in the investigation proceeding. Following a hearing, PURA issued a final decision in the penalty proceeding, imposing approximately $1.2 million in civil penalties for the plaintiff's noncompliance with certain identified performance standards. One half of that penalty—$593,823—was for the plaintiff's noncompliance with its obligations with respect to make safe crews, and one half was for failure to adequately communicate with Bridgeport officials and to prioritize restoring power to critical sites, such as senior living homes, in that city.

PURA also imposed civil penalties for the plaintiff's failure to timely report two minor accidents in violation of General Statutes (Rev. to 2019) § 16-16[2] and § 16-16-3 of the Regulations of Connecticut State Agencies. The decision in the penalty proceeding treated the reporting violations as continued violations under General Statutes (Rev. to 2019) § 16-41,[3] resulting in the assessment

[2] Hereinafter, unless otherwise indicated, all references to § 16-16 in this opinion are to the 2019 revision of the statute.

[3] One of the minor accident reports was due on September 10, 2020, and the other report was due on October 10, 2020. Although § 16-41 was amended during a special session in September, 2020; see Public Acts, Spec. Sess., September, 2020, No. 20-5, § 13 (effective October 2, 2020); those amendments are not relevant to this appeal. All references to § 16-41 in this opinion are to the 2019 revision of the statute.

of a $500 penalty for each day that each report was late, for a total of $61,000 in additional civil penalties.

The plaintiff appealed PURA's decisions in the investigation and penalty proceedings to the Superior Court, pursuant to the Uniform Administrative Procedure Act (UAPA). See General Statutes § 4-183. The plaintiff's primary claims on appeal were that (1) the reduction in the ROE ordered by PURA was unauthorized, in that PURA lacked statutory authority to impose it in the investigation proceeding, and was made using unlawful procedure, (2) the civil penalties for the late reporting of minor accidents were unauthorized, insofar as violations of § 16-16 are single, rather than continued, violations, and (3) the civil penalties for violating performance standards were unauthorized and were made using unlawful procedure.

The Office of Consumer Counsel (OCC) intervened as a defendant in both appeals,[4] which the trial court thereafter consolidated. Following a hearing, the court issued a memorandum of decision, upholding PURA's determinations and dismissing the plaintiff's appeals. The plaintiff appealed from the trial court's judgments to the Appellate Court, again raising each of the three previously mentioned challenges, and we transferred the appeal to this court pursuant to Practice Book § 65-1.

During the pendency of the appeal, in late 2022 and early 2023, PURA conducted hearings in the plaintiff's next regular rate case (2022 rate case). After the present

---

[4] The OCC, which filed a brief in this appeal, is an independent government agency designated by statute as the advocate for all consumers of the state's regulated electric, natural gas, water, and telecommunications utilities. See General Statutes § 16-2a (a). Section 16-2a (a) authorizes the OCC "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved . . . ." Unless otherwise noted, the arguments made by the OCC in this appeal largely track those of PURA.

appeal was fully briefed, PURA issued a decision in the 2022 rate case, wherein it declined to implement the previously ordered reduction to the authorized ROE. We then ordered the parties to file supplemental briefs addressing the question of whether PURA's failure to implement the ROE reduction rendered that portion of the plaintiff's appeal moot or unripe. Additional facts will be set forth as necessary.

## II

We first address PURA's argument that its decision in the 2022 rate case not to implement the fifteen basis point ROE reduction rendered moot—or unripe—the plaintiff's first set of claims, which contend that PURA lacked the statutory authority to implement that penalty in the investigation proceeding. See footnote 7 of this opinion. The plaintiff contends that the issue is not moot and remains ripe for adjudication. In the alternative, the plaintiff argues that, if we conclude that the issue is nonjusticiable, then both the trial court's judgment and PURA's order as to the ROE reduction should be vacated. We conclude that PURA's decision not to implement the penalty renders the issue moot and that that portion of the order, along with that portion of the trial court's judgment upholding the order, should be vacated.[5]

## A

The following additional procedural history is relevant to this issue. The investigation proceeding addressed the performance of Connecticut's two EDCs, the plaintiff and The Connecticut Light and Power Company, doing business as Eversource Energy (Eversource), both of which were found to have performed deficiently

---

[5] Because we conclude that the plaintiff's claim is moot, we need not address the question of ripeness, and we do not reach the question of whether PURA has the authority to impose a reduction to an authorized ROE in a storm performance investigation docket.

with respect to Tropical Storm Isaias. In its final decision, PURA stated that it "will order a reduction in each company's ROE in order to incentivize the EDCs to improve their management of future storm responses. The ROE approved for the EDCs in the next applicable ratemaking proceeding in which a final decision is issued . . . will accordingly be reduced. For [the plaintiff, PURA] will impose a fifteen basis point ROE reduction." (Footnote omitted.) PURA indicated that Eversource would be subject to a larger, ninety basis point reduction because a fifteen basis point reduction imposed on Eversource in 2014 had failed to incentivize that company to improve its storm preparedness and response. PURA characterized these reductions as "indefinite . . . ."

After briefing had been completed but before argument in the present appeal, PURA submitted a letter stating that PURA had issued a final decision in the plaintiff's 2022 rate case. PURA concluded that it was not necessary to impose the fifteen basis point ROE reduction on the plaintiff that PURA had authorized in the investigation proceeding. PURA explained this countermand by noting that the purpose of the reduction had been to incentivize the plaintiff to remedy the deficiencies noted during that proceeding. By 2022, as further explained by PURA, the plaintiff had provided evidence establishing that it had taken PURA's feedback seriously and, in most instances, had either remedied the deficiencies or effected operational changes calculated to remedy them. PURA concluded: "[PURA] finds that the fifteen . . . basis point reduction . . . appears to have achieved the . . . objective of incentivizing [the plaintiff] to implement improved storm response systems overall. With this objective met, [PURA] determines that the ROE reduction is not necessary to implement in this proceeding. However, [PURA]

will continue to closely monitor and review [the plaintiff's] storm preparation and response performance."

In the ensuing supplemental briefing ordered by this court, PURA argued that its decision not to implement the ROE reduction rendered moot the plaintiff's appellate challenges to that penalty. It argued that, because it had never actually reduced the plaintiff's ROE as a result of the investigation proceeding, and has no pending plans to do so, resolution of the appeal can afford the plaintiff no practical relief. The plaintiff responds that the appeal is not moot because both the voluntary cessation and collateral consequences exceptions to the mootness doctrine apply.

B

The principles and rules that govern the mootness doctrine are well established. "[A] case is considered moot if [the] court cannot grant the [litigant] any practical relief through its disposition of the merits . . . . [T]he . . . doctrine is designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions [that] may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . [A]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citations omitted; internal quotation marks omitted.) *State* v. *Gomes*, 337 Conn. 826, 838–39, 256 A.3d 131 (2021).

Our focus here is on the two exceptions to the mootness doctrine invoked by the plaintiff, voluntary cessation and collateral consequences. We conclude that

neither exception applies and, therefore, that this portion of the appeal is moot.

1

The voluntary cessation doctrine is predicated on the principle "that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior. . . . This exception applies especially to parties who cease the challenged behavior for the purpose of avoiding litigation. . . . [W]hen considering whether to apply the voluntary cessation exception in a particular case, the court must consider when and why a party ceased the challenged action." (Citations omitted; internal quotation marks omitted.) *CT Freedom Alliance, LLC* v. *Dept. of Education*, 346 Conn. 1, 23, 287 A.3d 557 (2023).

In addition, "[a]s between private parties . . . we have stated that a defendant's voluntary cessation of a challenged practice does not deprive a . . . court of its power to determine the legality of the practice . . . because, [i]f it did, the courts would be compelled to leave [t]he defendant . . . free to return to [its] old ways." (Internal quotation marks omitted.) Id., 20. "When governmental actors have voluntarily ceased the conduct alleged to have been unlawful, however, we have determined that some deference is appropriate. . . . [This deference] to governmental actions is consistent with that given in numerous federal court decisions."[6] (Citations omitted.) Id., 21–22.

---

[6] In *CT Freedom Alliance, LLC* v. *Dept. of Education*, supra, 346 Conn. 1, in adopting the rule that some deference should be afforded to government actors in these matters, we relied on the decisions of several federal courts, including a United States court of appeals decision. See id., 22–23. We still understand that approach to be "the prevailing norm" among the federal courts. *America Cargo Transport, Inc.* v. *United States*, 625 F.3d 1176, 1180 (9th Cir. 2010). At the same time, we see little indication that the United States Supreme Court has deferred to the government in its recent voluntary cessation decisions, and its most recent contribution to that line of cases casts some doubt on the ongoing vitality of the federal doctrine. See *Federal Bureau of Investigation* v. *Fikre*, 601 U.S. 234, 241, 144 S. Ct. 771, 218 L.

These considerations counsel against applying the voluntary cessation exception in the present case. PURA represents that its decision not to apply the ROE reduction was not made in response to the present litigation or for other strategic reasons. Rather, the decision was made in due course, at the plaintiff's next scheduled rate case, because the threatened reduction had served its purpose of incentivizing the plaintiff to substantially remedy the storm preparedness and response issues that PURA had identified. PURA further represents that it opted not to implement the reduction, that the reduction does not remain pending, and that the issue will arise again only if a new ROE reduction is imposed following a deficient response to some future event. We have no reason, on this record, to doubt the veracity of these representations by a government agency. See, e.g., *St. Pierre* v. *Solnit*, 233 Conn. 398, 400 and n.3, 402 and n.4, 658 A.2d 977 (1995) (this court was persuaded by representations of deputy commissioner of mental health that "[t]he Department [of Mental Health did] not anticipate reinstatement" of challenged policy (internal quotation marks omitted)). Under the specific facts of this case, we conclude that it is appropriate to afford PURA deference as a governmental actor that has ceased potentially unlawful conduct. We therefore conclude that the voluntary cessation exception to the mootness doctrine does not apply.

Ed. 2d 162 (2024) ("[the voluntary cessation doctrine] holds for governmental defendants no less than for private ones").

As a matter of Connecticut law, however, we have not been asked to revisit this aspect of *CT Freedom Alliance, LLC*, at this time, and we see no reason to do so. That decision permits us to assume the good faith of a coequal branch of government, without requiring that we approve of patently strategic behavior, accept uncritically what appear to be flimsy or self-serving representations, or otherwise pay greater solicitude to government actors than is warranted under the circumstances of a particular dispute. See *CT Freedom Alliance, LLC* v. *Dept. of Education*, supra, 346 Conn. 22 ("[this deference] does not constitute a guarantee of unquestioned acceptance of governmental representations" (internal quotation marks omitted)).

We are not persuaded by the plaintiff's argument that PURA's vague warning that it "will continue to closely monitor and review [the plaintiff's] storm preparation and response performance" is tantamount to "reserving to itself the unreviewed power to reimpose the same ROE penalties in the future." When PURA intends to threaten the imposition of a specific penalty, it does so expressly, as it did in the 2014 Eversource rate case. See Public Utilities Regulatory Authority, Decision on the Application of The Connecticut Light and Power Company To Amend Rate Schedules, Docket No. 14-05-06 (December 17, 2014) p. 152 ("[i]f [Eversource] fails to improve [with respect to] major storm preparedness and response and is found not to be in compliance with the outage restoration standards established by [PURA's] November 1, 2014 [d]ecision . . . [PURA] may impose penalties as defined in that [d]ecision and reduce [Eversource's] going forward ROE to create an incentive for [Eversource] to improve its performance"). We understand the cited language in the present case, by contrast, to be nothing more than a benign statement of the fact that, notwithstanding PURA's decision not to implement the penalty for the plaintiff's response to Tropical Storm Isaias, PURA will continue to carry out its mission of ensuring that EDCs, such as the plaintiff, provide the public with safe, clean, reliable, and affordable utility service and infrastructure.

2

Turning to the collateral consequences exception, we note that "[t]his court has recognized . . . that a case does not necessarily become moot by virtue of the fact that . . . due to a change in circumstances, relief from the actual injury is unavailable. We have determined that a controversy continues to exist, affording the court jurisdiction, if the actual injury suffered by the litigant potentially gives rise to a collateral injury from which the court can grant relief. . . . [F]or a litigant

to invoke successfully the collateral consequences doctrine, the litigant must show that there is a reasonable possibility that prejudicial collateral consequences will occur. . . . The reviewing court therefore determines, based [on] the particular situation, whether . . . the prejudicial collateral consequences are reasonably possible." (Citation omitted; internal quotation marks omitted.) *State* v. *Gomes*, supra, 337 Conn. 839–40.

The plaintiff offers two theories as to why the collateral consequences exception applies, neither of which we find persuasive. First, the plaintiff lists various legal errors that PURA allegedly committed—the same errors that are the basis for the plaintiff's appeal of the ROE order[7]—and contends that allowing those errors to go uncorrected would harm it in ways unspecified. But an opinion resolving those issues would be purely advisory; it could afford the plaintiff no present relief. That sort of purely academic dispute does not give rise to a live controversy between the parties or allow for effective relief so as to qualify as a collateral consequence. See, e.g., *Waterbury Hospital* v. *Connecticut Health Care Associates*, 186 Conn. 247, 250, 440 A.2d 310 (1982) ("[when] the question presented is purely academic, we must refuse to entertain the appeal" (internal quotation marks omitted)). If it did, the exception would swallow the rule, and few if any appeals would be moot.

---

[7] The plaintiff contends that PURA improperly used a statutory storm performance investigation docket to impose ROE reductions that exceed the express limits of General Statutes § 16-32i, imposed improper double penalties for the same underlying conduct, and wrongly conflated the ratemaking standard of prudence with the distinct reasonableness standard that PURA adopted for storm performance review under § 16-32i. Because we conclude that the claim is moot, we do not reach these issues.

Moreover, although § 16-32i was amended during a special session in September, 2020; see Public Acts, Spec. Sess., September, 2020, No. 20-5, § 9 (effective on October 2, 2020); those amendments are not relevant to this appeal. In the interest of simplicity, we hereinafter refer to the current revision of the statute.

Second, and more plausibly, the plaintiff contends that there is a reasonable possibility that, in some future proceeding, PURA will treat the never imposed fifteen basis point ROE reduction as precedential and use it to justify the imposition of a more serious penalty. The plaintiff points out that PURA followed precisely that approach in the proceedings that gave rise to this litigation, imposing a ninety basis point ROE reduction on Eversource because a prior fifteen basis point reduction issued in response to that company's 2011 storm performance had not sufficiently incentivized Eversource to make the necessary improvements. In other words, the plaintiff posits, if we decline to resolve its challenges to PURA's decision, then, in the future, there is a reasonable possibility that the plaintiff will be treated more harshly as a recidivist.

We agree that the plaintiff has identified a cognizable collateral consequence to PURA's decision. The concern is that, in future proceedings, PURA would treat the plaintiff as it did Eversource and impose a higher ROE reduction next time on the basis of already having determined that the plaintiff should receive a fifteen basis point reduction. That action would undoubtedly qualify as a collateral consequence. The question is whether, "based [on] the particular situation . . . the prejudicial collateral [consequence is] reasonably possible" to occur. (Internal quotation marks omitted.) *State* v. *Gomes*, supra, 337 Conn. 840.

We think that it is not. For the ROE reduction to become relevant, the plaintiff again would have to be deficient in its storm preparation and response in connection with some future event. That seems unlikely given that PURA has already determined that most of the cited violations have been corrected.

Moreover, at oral argument before this court, the OCC's attorney took the position that the fifteen point

ROE reduction, although styled as "indefinite," is now a dead letter. The OCC's attorney further contended that PURA would not afford any precedential value to a reduction that was never applied. PURA's counsel also represented that the agency has no intention of relying on the Tropical Storm Isaias proceedings in future storm investigations (although it reserved the right to do so).

On the basis of the foregoing, considering together the low likelihood that the plaintiff would reoffend and the extremely low likelihood that PURA would opt to rely on the Tropical Storm Isaias proceedings, we conclude that there is not a reasonable possibility that the plaintiff will suffer a collateral consequence as a result of the challenged order. See, e.g., *Rek* v. *Pettit*, 222 Conn. App. 132, 140, 303 A.3d 926 (2023) (concluding that prospect of further litigation between parties regarding child visitation was mere conjecture), cert. denied, 348 Conn. 948, 308 A.3d 36 (2024).[8] In any event, if PURA were to impose, or reimpose, such penalties in a future action, the plaintiff would have the opportunity to challenge the legality of such action and PURA's interpretation of its legal authority at that time. The plaintiff's appeal of the ROE reduction is moot.

## C

Having determined that the ROE reduction issue is moot, we next consider whether the portion of PURA's order authorizing that penalty, and that portion of the trial court's judgment upholding the order, should be vacated. The following principles govern our analysis.

"[W]hen an appeal is dismissed as moot, the party who is unable to obtain judicial review should not be

---

[8] Although it flows from, rather than contributes to, our mootness analysis, we note that, because we are directing the vacatur of PURA's order regarding the ROE reduction; see part II C of this opinion; any possibility of collateral consequences attendant to, or arising from, that order is eliminated.

barred from relitigating the factual and legal issues decided in rendering that judgment." (Internal quotation marks omitted.) *Thornton* v. *Jacobs*, 339 Conn. 495, 501, 261 A.3d 738 (2021). "Vacatur is commonly utilized . . . to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences. . . . In determining whether to vacate a judgment that is unreviewable because of mootness, the principal issue is whether the party seeking relief from [that] judgment . . . caused the mootness by voluntary action. . . . A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment. . . . The same is true when mootness results from unilateral action of the party who prevailed below."[9] (Internal quotation marks omitted.) Id., 502; see also *Metropolitan District Commission* v. *Marriott International, Inc.*, 348 Conn. 963, 963–64, 312 A.3d 34 (2024).

Less well settled in Connecticut is the question of whether we may direct the vacatur of a mooted decision of an administrative agency or whether we can vacate only the judgment of the trial court affirming that decision. Although the parties have not directed our attention to any cases in which this court has vacated, or directed the vacatur of, an agency decision that has

---

[9] Some of our decisions have suggested that the appellant also bears the burden of establishing that "the public interest would be served by a vacatur." (Internal quotation marks omitted.) *Thornton* v. *Jacobs*, supra, 339 Conn. 502. However, the United States Supreme Court cases from which that language was borrowed indicate that the public interest requirement is presumptively satisfied when the prevailing party renders the appeal moot through its unilateral action. See, e.g., *Alvarez* v. *Smith*, 558 U.S. 87, 98, 130 S. Ct. 576, 175 L. Ed. 2d 447 (2009) (Stevens, J., concurring in part and dissenting in part); *U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U.S. 18, 26–27, 115 S. Ct. 386, 130 L. Ed. 2d 233 (1994). Thus, the fact that PURA's ROE order arguably impacts only the plaintiff and, potentially, other EDCs is not an obstacle to the plaintiff's request that we direct the vacatur of the order.

become moot, we note that the Appellate Court has directed the vacatur of a mooted decision of an administrative agency on at least one occasion, albeit without discussion of the issue. See *Savin Gasoline Properties, LLC* v. *Commission on the City Plan*, 208 Conn. App. 513, 515, 262 A.3d 1027 (2021).

Moreover, we have generally followed the federal courts' approach in applying the equitable remedy of vacatur. *State* v. *Charlotte Hungerford Hospital*, 308 Conn. 140, 143, 60 A.3d 946 (2013). The federal courts have a policy of vacating agency decisions when such decisions have been rendered moot by the vagaries of circumstances outside of the plaintiff's control or by the unilateral action of the party who prevailed in the underlying proceeding. See, e.g., *A. L. Mechling Barge Lines, Inc.* v. *United States*, 368 U.S. 324, 329, 82 S. Ct. 337, 7 L. Ed. 2d 317 (1961) (concluding that rules regarding vacatur of unreviewed judgment adopted in *United States* v. *Munsingwear, Inc.*, 340 U.S. 36, 39–40, 71 S. Ct. 104, 95 L. Ed. 36 (1950), are "equally applicable to unreviewed administrative orders"); *Public Citizen, Inc.* v. *Federal Energy Regulatory Commission*, 92 F.4th 1124, 1126–27, 1131 (D.C. Cir. 2024) (vacating mooted agency orders); *Valspar Sourcing, Inc.* v. *PPG Industries, Inc.*, 780 Fed. Appx. 917, 921 (Fed. Cir. 2019) ("[the United States Court of Appeals for the Federal Circuit] has . . . repeatedly relied on [*Munsingwear, Inc.*] to vacate agency actions"). PURA does not contest that this court likewise has the equitable authority to direct vacatur of a mooted agency decision.

In the present case, the plaintiff has met its burden of demonstrating equitable entitlement to vacatur of PURA's contested ROE order and that portion of the trial court's judgment sustaining the order. It was the prevailing party, PURA, whose unilateral action rendered the plaintiff's appeal moot, who then invited us to hold that it is moot, and who later represented in a

supplemental brief submitted in this appeal that it has no intention of reinstating the challenged penalties. The plaintiff has pursued every available avenue both to reverse PURA's ROE order and to overturn the legal precedent that it established. Directing the vacatur of that portion of the order also eliminates any lingering concerns regarding collateral consequences, such as that the plaintiff may in the future be subject to heavier penalties for any misconduct as a result of having been sanctioned in this case.

## III

We next consider the plaintiff's challenge to the $61,000 penalty that PURA imposed for the plaintiff's delay in reporting two minor accidents in the aftermath of Tropical Storm Isaias. The plaintiff's primary claim is that PURA improperly treated the delay in reporting as a continued violation and imposed a $500 daily penalty for each unreported incident. The plaintiff contends that the statutory scheme at that time authorized only a onetime penalty for the delayed reporting of each minor accident, so it should not have been fined more than $1000. PURA takes the position that delayed reporting of a minor accident qualified as a continued violation, for which it could impose a daily fine. We find neither party's interpretation of the relevant statutes and regulations fully persuasive.[10] Rather, we con-

---

[10] The legislature subsequently amended § 16-16. See Public Acts 2023, No. 23-102, § 12 (P.A. 23-102); Public Acts 2022, No. 22-20, § 5. The current version of the statute provides that delayed reporting of minor accidents qualifies as a continued violation and that PURA may impose an additional fine for each day that reporting is delayed. See P.A. 23-102, § 12. The new penalty provision of the statute provides: "Any person, company or electric supplier that fails to comply with the provisions of this section shall be fined not more than one thousand dollars for each offense. A violation of the provisions of this section concerning the reporting of accidents, except minor accidents, shall constitute a continued violation, pursuant to section 16-41, for the period from the date the person, company or electric supplier is required to notify the chairperson of the authority by telephone or otherwise of the accident until the date the authority receives such notice in writing. *A violation of the provision of this section concerning the reporting*

clude that, in 2020, General Statutes (Rev. to 2019) §§ 16-16 and 16-41, and § 16-16-3 of the Regulations of Connecticut State Agencies permitted a $500 fine for each month in which the plaintiff failed to report each minor accident to PURA.[11]

This claim presents a question of statutory interpretation. PURA does not contend that its interpretation of the relevant statutory and regulatory scheme is time-tested, such that deference to that interpretation would be warranted. See, e.g., *Connecticut Judicial Branch* v. *Gilbert*, 343 Conn. 90, 101–102, 272 A.3d 603 (2022) (we defer to agency's formally articulated interpretation of statutes it is tasked with enforcing when that interpretation is both time-tested and reasonable). Accordingly, our review is plenary, and our analysis is cabined by General Statutes § 1-2z. See, e.g., *Marshall* v. *Commissioner of Motor Vehicles*, 348 Conn. 778, 786, 311 A.3d 704 (2024).

The primary statutes at issue are §§ 16-16 and 16-41. At the time the minor accident reports were due in the fall of 2020, § 16-16 provided in relevant part: "Each public service company . . . subject to regulation by the Public Utilities Regulatory Authority shall, in the event of any accident . . . notify the authority thereof . . . as soon as may be reasonably possible after the

---

*of minor accidents shall constitute a continued violation, pursuant to* section *16-41, for the period from the date the person, company or electric supplier is required to notify the authority in writing of such minor accident until the date the authority receives such notice in writing.*" (Emphasis added.) General Statutes (Supp. 2024) § 16-16 (c). None of the parties contends that this amendment applies retroactively to the present matter or that it governs our interpretation of the version of the statute that was in effect in 2020.

[11] Although none of the parties briefed the question of whether delayed reporting of a minor accident qualified as a monthly, rather than a daily, violation during the relevant time period, the parties were afforded an opportunity to address that interpretation of the statute during oral argument before this court.

occurrence of such accident, unless such accident is a minor accident, as defined by regulations of the authority. Each such . . . company . . . shall report such minor accidents to the authority in writing, in summary form, once each month. . . . Any . . . company . . . failing to comply with the provisions of this section shall be fined not more than five hundred dollars for each offense."[12] On its face, General Statutes (Rev. to 2019) § 16-16 does not specify whether the failure to report a minor accident by the tenth day of the following month, as required by § 16-16-3 (c) of the Regulations of Connecticut State Agencies, is a single, complete offense, or whether the ongoing failure to report after the deadline has passed constitutes a new, fineable offense for each day or each month the report is late. The plaintiff argues that the former reading is the most reasonable interpretation of the statute.

PURA responds that § 16-16 must be read in conjunction with § 16-41, which governs the imposition of civil penalties under title 16 of the General Statutes. Section 16-41 (a) provides in relevant part: "Each . . . public service company . . . shall obey, observe and comply with all applicable provisions of this title . . . . Any such company . . . which the authority finds has failed to obey or comply with any such provision of this title,

---

[12] In § 16-16-2 (b) of the Regulations of Connecticut State Agencies, PURA clarified that the following types of accidents are minor accidents: "(1) Any structure fires or other cases of damage to a utility's facility or customer equipment, which were or may have been connected with or due to a utility's operation or equipment, where the public was not exposed to primary voltage;

"(2) Any accidents to employees or to members of the public which were or may have been connected with or due to a utility's operation, property or facility, including traffic accidents, resulting in property damage of $50,000 or more, or in personal injury, whether or not hospitalization is required, that are not considered a major accident . . . and

"(3) Any fatalities associated with any vehicular accident involving a utility's poles or other facilities but not involving the utility's employees or operation."

order or regulation shall be fined . . . in accordance with the penalty prescribed for the violated provision of this title or, if no penalty is prescribed, not more than ten thousand dollars for each offense . . . . Each distinct violation of any such provision of this title, order or regulation shall be a separate offense and, in case of a continued violation, each day thereof shall be deemed a separate offense. . . .''

There is no question that § 16-41 governs the imposition of fines under § 16-16; it regulates PURA's imposition of civil fines for all of title 16, even for sections of that title that establish their own penalties. The question before us, then, is whether the ongoing failure to timely report a minor accident under § 16-16 qualifies as a "continued violation" under § 16-41 (a), so that a $500 fine may be imposed for each day that reporting is delayed.

There is no definition of the term "continued violation" in § 16-41 or elsewhere in the General Statutes. Black's Law Dictionary defines a "continuing offense" as one that is "uninterrupted"; Black's Law Dictionary (7th Ed. 1999) p. 316 (defining "continuing"); or "committed over a period of time . . . ." Id., p. 1108 (defining "continuing offense"); see also, e.g., *In re Pre-Filled Propane Tank Antitrust Litigation*, 860 F.3d 1059, 1066 (8th Cir. 2017) (in statute of limitations context, continuing violations are those that "[inflict] continuing and accumulating harm" (internal quotation marks omitted)), cert. denied sub nom. *Ferrellgas Partners, L.P.* v. *Morgan-Larson, LLC*, 583 U.S. 1053, 138 S. Ct. 647, 199 L. Ed. 2d 530 (2018); *Marshall* v. *Manville Sales Corp.*, 6 F.3d 229, 231 (4th Cir. 1993) (unlawful employment discrimination constitutes "continuing violation" for as long as compensation disparity exists). When our legislature has provided for additional penalties for continuing violations but has failed to specify whether a particular offense qualifies as a continuing violation,

this court has upheld the determination that a particular offense was a continuing one when treating the offense as a continuing violation was consistent with the policy goals embodied in the broader legislative scheme. See *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 197–99, 629 A.2d 1116 (1993) (defendants' ongoing failure to remove solid waste that they had illegally dumped in protected wetland qualified as continuing violation of General Statutes § 22a-32).

The parties do not dispute that the failure to report a *major* accident "as soon as may be reasonably possible"; General Statutes (Rev. to 2019) § 16-16; but not beyond the twenty-four hour deadline of § 16-16-3 (a) of the Regulations of Connecticut State Agencies, represents a continued violation under § 16-41. That ongoing failure to report after the deadline has passed involves a continued breach of the statutory duty to report, rather than a single, discrete offense, such as the offenses discussed in part IV of this opinion. The resulting harm continues to accumulate until the public service company files the report formally, notifying PURA of each accident. Specifically, PURA is required by statute to promptly study fatal accidents and any other accidents that it deems to require investigation, "mak[ing] a record of the causes, facts and circumstances of each accident, within three months thereafter, and as a part of such record . . . suggest[ing] means . . . whereby similar accidents may be avoided in the future." General Statutes § 16-17. In other words, PURA has a narrow window of time after having been notified of a major accident during which to assess the need for investigation, to carry out that investigation, and to develop a plan to prevent similar accidents in the future.[13] Any

_____

[13] This investigation is one essential component of PURA's broader statutory obligations within a complex, multitiered regulatory system intended to secure the public safety before, during, and after storms and other potential threats to safety and service. Those obligations include reviewing the overall performance and service restoration practices of each EDC after emergen-

delay in reporting a major accident deprives PURA of its ability to perform its statutory oversight and investigation functions, potentially placing public safety at ongoing, daily risk. Moreover, if there were no threat of incurring additional fines for the ongoing failure to report a major accident, a public service company would have little incentive ever to file the required report once it had missed the initial deadline. That would thwart the plain intent and legislative purpose of the statute.

The question before us is whether the same can be said of the failure to timely report a *minor* accident. We reject the plaintiff's contention that the failure to report such an accident is a single, distinct violation that can be committed only once, so that the maximum fine for failing to report any particular accident is capped at $500. See General Statutes (Rev. to 2019) § 16-16. If that were the case, then, once a public service company has missed the initial reporting deadline, it would have little incentive ever to report the accident. As with major accidents, the purpose of the statutory requirement would be thwarted, contrary to its remedial nature. See, e.g., *Greenwich* v. *Dept. of Public Utility Control*, 219 Conn. 121, 126, 592 A.2d 372 (1991) (noting remedial nature of statutory scheme); *Connecticut Co.* v. *Nor-*

cies; see General Statutes §§ 16-32h (c) (1) and 16-32i; maintaining a docket to establish acceptable emergency performance standards and to review each company's service restoration practices; see General Statutes § 16-32h (b) and (c) (1); establishing and supervising roadside tree care policies and practices so as to ensure that public utilities cost-effectively minimize tree related accidents and equipment damage; see General Statutes § 16-32h (b) and (c) (4); and establishing any other performance standards necessary to ensure service reliability and prompt service restoration. See General Statutes § 16-32h (c) (6) and (e); see also General Statutes § 16-11 ("[t]he Public Utilities Regulatory Authority shall, so far as is practicable, keep fully informed as to the condition of the plant, equipment and manner of operation of all public service companies . . . in respect to their relation to the safety of the public and . . . may order such reasonable improvements, repairs or alterations in such plant or equipment, or such changes in the manner of operation, as may be reasonably necessary in the public interest").

*walk*, 89 Conn. 528, 533, 94 A. 992 (1915) ("The Public Utilities Act [which established the regulatory scheme now codified at title 16 of the General Statutes] was passed upon the public demand for greater public protection through larger control of and supervision over public service corporations. The [a]ct is broad in its sweep, extensive in the jurisdiction conferred, and far-reaching in the supervision of public service corporations and the control over public and private interests. It is essentially a remedial statute, and as such . . . is to receive a liberal construction designed to effectuate its cardinal purpose.").

PURA's interpretation of the statute, by contrast, is a plausible one. When the deadline to report the two minor accidents had passed, the plaintiff arguably remained in violation of its reporting duty and the harm—depriving PURA of the opportunity to investigate and take any appropriate safety measures—continued to accrue each day that the reporting was delayed.

But PURA's interpretation is not the only reasonable interpretation of the statutory language. PURA essentially reads § 16-16 and the associated regulations to mean that there is a duty to report all minor accidents by the tenth day of the following month and that, once that deadline has passed, there continues to be a *daily* duty to file the report. Another plausible interpretation of § 16-16 is that, once every month, each public service company is required to notify PURA of any minor accidents that have occurred. This interpretation is consistent with the wording of § 16-16, which requires that minor accidents be reported "once each month," rather than "by the following month." On this view, the violation is, essentially, the failure to include an unreported accident in a company's monthly report to PURA, so that each subsequent monthly failure to report such an accident constitutes one new, distinct violation.

Because both of these interpretations are consistent with the language of the statute, we conclude that § 16-16 is ambiguous. Therefore, we look to the legislative history and the underlying purposes of the legislative scheme. See General Statutes § 1-2z. The "continued violation" language first appeared in 1911 in the original enabling statute of the Public Utilities Commission, a predecessor agency to PURA. Public Acts 1911, c. 128, § 35. Although various versions of the enabling legislation were considered by the Judiciary Committee that year, those proceedings unfortunately were never recorded. With respect to the statutory requirement that accidents be reported to the Public Utilities Commission, the original version of the law drew no distinction between major and minor accidents, simply requiring that public service companies report all accidents, regardless of whether they resulted in injury, "as soon as may be reasonably possible," and that oral reports be confirmed in writing within five days of each accident. Public Acts 1911, c. 128, § 17.

In 1977, the legislature amended the statute to add a different, monthly reporting requirement for minor accidents. See Public Acts 1977, No. 77-254. Although the legislative history of the 1977 amendment is sparse, it suggests that it was the Public Utilities Control Authority, another predecessor agency to PURA, that sought the amendment. The Public Utilities Control Authority appears to have requested that minor accidents be reported only once each month, and in summary form, in order to help it manage its paper flow. See Conn. Joint Standing Committee Hearings, Regulated Activities, Pt. 2, 1977 Sess., p. 623; see also 20 S. Proc., Pt. 4, 1977 Sess., p. 1440, remarks of Senator Cornelius O'Leary. This history lends support to the theory that delayed reporting of a minor accident should be subject only to a monthly fine, insofar as PURA's predecessor

requested that reports not be submitted on an expedited, daily basis.

This balancing of interests, in which the reporting of minor accidents in summary form is required but not deemed to be a matter of urgency, is consistent with the underlying purposes of the legislative scheme and the very nature of a minor accident. A minor accident is, by definition, less serious than a major one, and the failure to timely report a minor accident is correspondingly less harmful than the failure to report a major one. There also is less urgency with respect to PURA's interest in learning of minor accidents, as reflected in the more generous reporting deadline and the fact that there is always at least a ten day period to file a written report. See Regs., Conn. State Agencies § 16-16-3 (c). This, along with the fact that, pursuant to General Statutes (Rev. to 2019) § 16-16 and § 16-16-3 (c) of the Regulations of Connecticut State Agencies, companies need only report minor accidents in "summary form," presumably reflects the fact that, for most minor accidents, as opposed to major accidents, there is less concern that an ongoing threat to safety or property may exist. In short, although it is important that all minor accidents get reported to PURA in a timely fashion and that the EDCs continue to be incentivized to make such a report, we see no indication that the legislature intended to treat an EDC's failure to timely report a minor accident in its monthly accident report as a continued violation.

For these reasons, we conclude that the version of § 16-16 that was in effect in 2020, when the relevant events occurred, made each monthly failure to timely report a minor accident a single, distinct offense for purposes of § 16-41. On the facts of this case, therefore, the plaintiff committed three distinct offenses with respect to its failure to report a minor accident in Hamden and two distinct offenses with respect to its failure to report a minor accident in Woodbridge. With respect

to the minor accident in Hamden, the accident was reported to the plaintiff on August 19, 2020, and, therefore, was required to be reported to PURA no later than September 10, 2020 (the tenth of the following month) in accordance with § 16-16-3 (c) of the Regulations of Connecticut State Agencies. Because the accident was not reported until November 25, 2020, the plaintiff missed three monthly reporting deadlines—one on September 10, 2020, one on October 10, 2020, and one on November 10, 2020—which constituted three distinct offenses. As to the minor accident in Woodbridge, the accident was reported to the plaintiff on September 10, 2020, and, therefore, was required to be reported to PURA no later than October 10, 2020. Because the accident was not reported to PURA until November 25, 2020, the plaintiff missed two monthly reporting deadlines— one on October 10, 2020, and one on November 10, 2020—which constituted two distinct offenses. On remand, PURA is directed to recalculate the fines consistent with this understanding of the statutory and regulatory scheme.[14]

## IV

Lastly, we turn to the plaintiff's challenges to the roughly $1.2 million in fines that PURA had imposed for the plaintiff's violation of storm performance standards. The plaintiff challenges two findings underlying PURA's determination that the plaintiff violated § 16-32i: that the plaintiff failed to timely provide a dedicated make safe crew for Bridgeport and that it failed to properly prioritize the city's critical restoration sites. We agree with the trial court that there is sufficient evidence in the record to support PURA's findings.

Our disposition of these claims is controlled by the highly deferential standard of review imposed by stat-

---

[14] We have reviewed the plaintiff's other challenges to the minor accident reporting penalty and find them to be without merit.

ute. Under the UAPA, a trial court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." General Statutes § 4-183 (j). The trial court concluded, and we agree, that the plaintiff's challenges are, in essence, factual disputes and, therefore, that we must uphold PURA's decision unless we determine that its findings are clearly erroneous or unsupported by substantial evidence.

## A

The plaintiff first contends that PURA incorrectly found a violation of an established performance standard when penalizing the plaintiff for not timely and consistently providing a dedicated make safe crew to Bridgeport. The following additional facts and procedural history are relevant to this claim.

At the time of the storm, the Connecticut Emergency Support Function 12: All Hazards Energy and Utilities Annex (annex), which was incorporated by reference in the plaintiff's emergency response plan (adopted pursuant to General Statutes § 16-32h (b)), provided in relevant part that, "[i]n response to an emergency situation, upon request by the local [e]mergency [m]anagement [d]irector, [the plaintiff] shall provide a dedicated line construction and line clearance crew to each

[municipality] for road clearing. . . ." Connecticut Emergency Support Function 12: All Hazards Energy and Utilities Annex (August, 2013) p. 25, available at https:// portal.ct.gov/-/media/DEMHS/_docs/Plans-and-Publications/ EHSP0061-SRF-ESF12--EnergyandUtilitiesAnnex.pdf (last visited October 28, 2024). PURA found that the plaintiff had failed to satisfy this obligation: "Bridgeport faced . . . extensive challenges locating make safe crews in the first few days of the restoration period. . . . Assigned make safe crews abandoned city make safe crews on August 5, 2020, with no notice from [the plaintiff]. . . . Further . . . [the plaintiff] removed very early on the dedicated make safe crews from Bridgeport, while blocked roads remained uncleared. . . . [The plaintiff] did not proactively notify [Bridge-port] that it was removing the crew[s], nor did it provide an estimate for when [the crews] would return." (Citations omitted.)

On appeal to this court, the plaintiff does not dispute that there is some support in the record for these findings. For example, it acknowledges that, on August 6, 2020, the second full day of storm recovery efforts, it failed to provide a make safe crew to Bridgeport during a twelve hour period from 7 a.m. to 7 p.m. Rather, the plaintiff contests PURA's ultimate determination that the plaintiff violated § 16-32i, which provides in relevant part that PURA, "upon a finding that any [electric distri-bution] company failed to comply with any standard of acceptable performance in emergency preparation or restoration of service in an emergency, adopted pursu-ant to section 16-32h, or with any order of the authority . . . may levy civil penalties against such company . . . ." The plaintiff argues that the conclusion that it violated § 16-32i is contradicted by other evidence, such as statements by Tyisha S. Toms, one of Bridgeport's associate city attorneys, implying that the plaintiff com-plied with its emergency response plan.

To the extent that the plaintiff's claim is that § 16-32i requires only substantial compliance with a company's emergency response plan, it has pointed to nothing in the statutory language to support that interpretation. Indeed, the statute permits PURA to impose a civil penalty for failure to comply with "*any* standard of acceptable performance . . . ." (Emphasis added.) General Statutes § 16-32i. The record contains evidence of various such failures. In any event, PURA was free to determine that the plaintiff's failure to provide dedicated make safe crews to Bridgeport, Connecticut's largest city, for an entire twelve hour period, early in the storm recovery process, and without adequate communication and collaboration, constituted a more than de minimis violation. Even if, as the plaintiff contends, the emergency response plan permits some flexibility in how the plaintiff carries out its duties, PURA also had the authority to determine that the plaintiff's decision to remove make safe crews at that time, for that long, and without adequate discussion, was an abuse of that discretion.

To the extent that the plaintiff's argument is that PURA should have credited Toms' opinion that the plaintiff had complied with its obligations, those sorts of determinations are for the agency, as the trier of fact, and will not be second-guessed by an appellate tribunal. See General Statutes § 4-183 (j). PURA reasonably could have chosen not to credit Toms' testimony and, instead, to credit the opinion of Scott T. Appleby, director of Bridgeport's Office of Emergency Management and Homeland Security, that the plaintiff's performance had been, "quite frankly . . . unacceptable." Or it could have agreed with the contention of Toms' supervisor, Bridgeport City Attorney R. Christopher Meyer, in Bridgeport's August 6, 2020 motion, that the plaintiff's "response to [the] storm [had] been made all the more

difficult by [its] abject failure to plan for such an event or to properly carry out such a plan."

B

The plaintiff also challenges PURA's determination that the plaintiff violated § 16-32i by, among other things, failing to properly prioritize restoring power to certain critical sites, including several senior living homes, and to rectify a public safety issue on Old Town Road. The plaintiff contends that the senior living facilities did not appear on Bridgeport's predesignated list of critical sites and that, once Appleby asked the plaintiff to prioritize them, power was restored by the following evening. It further contends that, because no established storm performance standard was violated, PURA lacked the statutory authority to impose a civil penalty for the alleged violation.

Even if we were to agree with the plaintiff as to those challenges, on the merits of which we express no opinion, the civil penalty can be sustained on an independent ground. PURA imposed a civil penalty of $593,823 for (1) the plaintiff's failure to adequately communicate with Bridgeport officials regarding storm recovery efforts *and* (2) its failure to prioritize the city's critical restoration sites.[15] Maintaining effective com-

---

[15] It seems clear that PURA would have imposed the same $593,823 fine, even if it had found violations only of the plaintiff's obligations to adequately communicate with Bridgeport officials. PURA's general approach has been to impose identical fines for each category of violations, regardless of the number or type of violations that comprise each category. With respect to Eversource, for example, PURA imposed identical $5 million fines for each of fourteen different categories of violations, departing from this pattern with respect to only one category of especially egregious violations, for which it imposed a fine of more than $28 million. Similarly, PURA initially calculated the plaintiff's fines by opting to fine the company a total of one half of one percent of the plaintiff's annual distribution revenues, and then dividing that total evenly between the three classes of violations. PURA later concluded that one entire category of violations had not in fact occurred, leaving two categories, each with an identical $593,823 fine.

munications was an independent requirement of the plaintiff's emergency response plan,[16] and there is sufficient evidence in the record to support PURA's finding that the plaintiff's communications with city officials were at times inadequate.[17] Accordingly, in light of our "highly deferential" standard of review of such matters; *Sams* v. *Dept. of Environmental Protection*, 308 Conn. 359, 374, 63 A.3d 953 (2013); we will not disturb PURA's determination that the plaintiff did not fully satisfy the requirements of its emergency response plan.[18]

The appeal is dismissed in part, the judgment in the administrative appeal concerning the investigation proceeding is vacated with respect to the imposition of the fifteen basis point ROE penalty, and the matter is remanded with direction to vacate PURA's imposition of that penalty; the judgment in the administrative appeal concerning the penalty proceeding is reversed with respect to the fines imposed for the plaintiff's failure to timely report two minor accidents and the matter is remanded with direction to remand to PURA

---

[16] The plan, for instance, commits the plaintiff to "[ensuring that] communications with the public, customers, media, regulatory agencies, and federal, state, and local governments operate effectively in order to exchange accurate and timely information on system conditions and restoration activities." The plaintiff reiterates throughout the plan that "[e]ffective, timely and accurate communications with internal and external stakeholder groups [are] a critical part of the restoration process." Although the plaintiff contends that PURA improperly relied on communications standards established in the annex, in fact, the plaintiff's emergency response plan itself incorporates by reference the communications standards set forth in the annex.

[17] There was evidence, for instance, that Bridgeport attempted multiple times to identify vulnerable customers and to develop priority restoration locations through the liaison process but received no response or inaccurate information from the plaintiff. There was further evidence that the plaintiff failed to respond to direct inquiries from Bridgeport Mayor Joseph P. Ganim.

[18] We have reviewed the plaintiff's other challenges to the factual findings and discretionary decisions underlying the civil penalties that PURA imposed for violations of § 16-32i, and we find them to be without merit.

for the recalculation of those fines in accordance with this opinion; the judgments are affirmed in all other respects.

In this opinion the other justices concurred.